IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

Appeal Number: 23-13906-JJ

---

DOUGLAS CHAVEZ,

*Appellant,*

v.

UNITED STATES,

*Appellee.*

---

Appeal from the United States District Court
for the Southern District of Florida

District Case No.: 22-CR-20105

---

**BRIEF OF APPELLANT**

---

Juan Mourin; Lana Cucchiella
Fla. Bar No. 103438; 88997
Law Offices of Grey & Mourin
1400 NW 10th Avenue
Suite RG6
Miami, FL 33136
Tel: (305) 325-8119
Fax: (305) 325-0569
Eservice@greyandmourin.com
Counsel for Appellant

i

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26-1, the Appellant provides the following list of persons who have an interest in the outcome of this appeal:

Catala, Maria

Chavez, Douglas

Cucchiella, Lana

Gayles, Hon. Darrin

Mourin, Juan

Torres, Hon. Edwin G.

## STATEMENT REGARDING ORAL ARGUMENT

Chavez respectfully submits that oral argument is appropriate in this case, especially where the denial of his Motion to Suppress is to be reviewed *de novo,* and turns heavily upon the factual history known best to the parties. Accordingly, pursuant to Fed. R. App. Proc. 34(a), Chavez respectfully requests the Court to permit oral argument in this matter.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

I.  JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . .2

III. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. Facts Relevant to Motion to Suppress. . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.  Tip Received by Law Enforcement . . . . . . . . . . . . . . . . . . . . . . . 4

        2.  Agents' Coercive Encounter with Chavez. . . . . . . . . . . . . 5

        3.  Agents' Warrantless Search of the Home. . . . . . . . . . . . . . . . 14

        4.  Agents' Application for a Warrant. . . . . . . . . . . . . . . . . . . . . . 14

    B. Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

IV.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

V.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    A. The Warrantless Search Must be Excised from the Affidavit  . . . . . . . . 32

        1.  Consent to Search: an Overview of Voluntariness. . . . . . . . . . . . 32

        2.  Chavez Did Not Voluntarily Consent to
           the Warrantless Search of the Home. . . . . . . . . . . . . . . . . . . . . . 36

    B.  The Affidavit Contains, and Must be Adjusted, to Offset
      Agents' Misrepresentations and Omissions. . . . . . . . . . . . . . . . . . . . . 54

    C. The Affidavit Did Not Establish Probable Cause to
      Issue the Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    D. The Good Faith Exception Does Not Apply. . . . . . . . . . . . . . . . . . . . . 65

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

VII. CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VIII.  CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## TABLE OF AUTHORITIES

*Florida v. Bostick,* 501 U.S. 429, 435 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Florida v. Royer,* 460 U.S. 491 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Franks v. Delaware*, 438 U.S. 15 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Gonzalez v. State,* 578 So.2d 729 (Fla. 3rd DCA 1991) . . . . . . . . . . . . . . . . . . . . 29

*Illinois v. Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 48, 59

*Katz v. United States,* 389 U.S. 37 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Kentucky v. King,* 131 S. Ct. 18849, 1865 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Payton v. New York,* 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ohio v. Robinette,* 519 U.S. 33, 40 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). . . . . . . . . . . . . . . . . . .24, 30

*Terry v. Ohio*, 392 U.S. 1, 12, (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

*Thomas v. United States, 775 Fed. Appx. 477, 480 (11th Cir. 2019)* . . . . . . . . . . .14

*Tukes v. Dugger,* 911 F.2d 508 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . .44

*United States v. Chaves,* 169 F.3d 687 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . 26

*United States v. Edwards,* 813 F.3d 953 (10th Cir. 2015) . . . . . . . . . . . . . . . .50-43

*United States v. Espinosa-Orlando,* 704 F.2d 507 (11th Cir. 1983) . . . . . . . . .42, 43

*United States v. Garcia,* 890 F.2d 355 (11th Cir, 1989). . . . . . . . . . . . . . . . . . . . 43

*United States v. Goldstein,* 989 F.3d 1178 (11th Cir. 2021). . . . . . . . . . . . . . . . . 27

*United States v. Hendon,* 253 Fed. Appx. 809 (11th Cir. 2007) . . . . . . . . . . . . . 49

*United States v. Holley,* 831 F.3d 322 (5th Cir. 2016). . . . . . . . . . . . . . . . . . . . .26

*United States v. Hall,* 565 F.2d 917 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . .40

*United States v. Freeman*, 2011 U.S. App. LEXIS 17902 (11th Cir. 2011).. . . . . 24

*United States v. Leon*, 468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States v. Long,* 866 F.2d 402 (11th Cir. 1989). . . . . . . . . . . . . . . . 30, 35, 43

*United States v. McGough,* 412 F.3d 1232 (11th 2005). . . . . . . . . . . . . . . . 28, 56

*United States v. Noriega,* 676 F.3d 1252 (11th Cir. 2012). . . . . . . . . . . . . . . . . 26

*United States v. Pupo-Reynaldo*, 470 F. App'x 873 (11th Cir. 2012) . . . . . . .30, 34

*United States v. Tobin,* 923 F.2d 1506 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . 30

*United States v. Spivey,* 861 F.3d 1207 (11th Cir. 2017) . . . . . . . . . . . . . . . *passim*

*United States v. Williams,* 177  Fed. Appx. 914 (11th Cir. 2006) . . . . . . . . . . . . 25

*United States v. Yarbrough,* 961 F.3d 1157, 1163 (11th Cir. 2020). . . . . . . . . . . .28

*Zurcher v. Stanford Daily,* 426 U.S. 547 (1978). . . . . . . . . . . . . . . . . . . . . . . . . 50

v

## I.  JURISDICTIONAL STATEMENT

This appeal arises from the denial of a dispositive Motion to Suppress, entered on May 04, 2023; and the judgment and sentence, entered on November 21, 2023.   Both the Order and Judgment were issued by the honorable Darrin J. Gayles, District Judge for the United States District Court in the Southern District of Florida.   The Appellant filed a timely Notice of Appeal on November 27, 2023.

The trial court had jurisdiction because the Appellant was charged with a violation of 18 U.S.C. § 2252 and § 2253, alleged to have occurred within the Southern District of Florida.   Under 28 U.S.C. § 1291, this Court has jurisdiction over the final decision of the District Court.

Before the District Court, the Appellant was the Defendant.  The Appellee was the prosecuting authority.  The Appellant will hereafter be referred to "Chavez", and the Appellee as "the Government".

Chavez will cite to documents in the Appendix with the designation "A". (Certain documents in the Appendix bear their original page numbers.  Numbers for pagination of the Appendix appear in black bold print in the bottom right corner of each page.)   "[DE]" signifies the docket entry number from the trial

1

court's docket.   The designation "audio" will refer to the timestamp of an audio recording that was admitted as an exhibit.[1]

## II.  STATEMENT OF THE ISSUES

Chavez was convicted of possession of child pornography.   Evidence underlying that conviction was seized via a search warrant (hereafter "**the warrant**").   In their affidavit in support of the warrant (hereafter "**the Affidavit**"), special agents from the FBI relied on observations made during a preceding warrantless search (hereafter "**the warrantless search**") of Chavez's home (hereafter "**the Home**").   Moreover, in drafting the Affidavit, agents omitted and misrepresented key facts related to the warrantless search.

In a Motion to Suppress (hereafter "**the Motion**"), Chavez challenged the warrant, arguing the warrantless search could not establish probable cause after being conducted in the absence of a *valid* consent.   (Any consent was the product of coercion memorialized in an audio recording of the encounter between Chavez

---

[1] *See* footnote 2, *infra.*

2

and the agents.[2])   Additionally, Chavez argued that after adjustments to offset agents' omissions and representations, the Affidavit failed to set forth probable cause.

The Motion was heard by Magistrate Judge Edwin Torres.  Magistrate Torres' factual findings were **entirely aligned** with the facts presented by Chavez; likewise, he designated the same relevant law as Chavez.  However, Magistrate Torres' *analysis* of the law was such that he ultimately recommended denial of the Motion.  Judge Darrin Gayles adopted Magistrate Torres' factual findings and analysis in a brief order.  However, in open court, Judge Gayles explained that his denial *actually* centered on an issue not disputed by the parties or addressed by Magistrate Torres: whether a non-verbal head nod could serve as consent.

The heartland issues of this appeal are: whether Chavez provided a valid consent for the warrantless search of the Home; and whether the Affidavit (adjusted to remove the fruits of the unlawful warrantless search and/or to offset the omissions and misrepresentations of law enforcement) lacked probable cause.

---

[2] A copy of the recording, and an unofficial transcript of the recording, was reviewed by the trial court.  A:58-85, [DE 28-2].  Both were moved into evidence, the former by, and the second without objection from, the Government.  A:155, A:295.  Testimony authenticated the recording. A:159.  "Although the transcript is not perfect, it is mostly accurate."  A:295.

In transmitting the record on appeal, the Clerk of Court noted that, due to the nature of that exhibit, it is not available electronically and would not be forwarded to this Court unless requested.  Chavez respectfully asks the Court to make that request.

## II.  STATEMENT OF THE CASE

Chavez offers summaries of: **(A)** the facts relevant to the Motion to Suppress, and **(B)** the procedural history of this case.

### (II)(A)  Facts Relevant to Motion to Suppress

The facts relevant to the Motion to Suppress are undisputed.  Chavez summarizes individually:  **(1)** the tip to law enforcement; **(2)** the agents' coercive encounter with Chavez; **(3)** the agents' warrantless search of Chavez's home; and **(4)** the agents' application for a warrant.

### (II)(A)(1)  Tip to Law Enforcement

In late 2021 or early 2022, the FBI  received a complaint regarding child erotica photographs ("**the Riley photos**").[3]  A:90.  The Riley photos were for sale as a set on Amazon, by an account named Ghost Photography.  A:90.  Chavez's name was associated with that account.  A:90.  The address associated with the account was a residential property (the Home), where Chavez resided with his parents.  A:90, 174, 294.

### (II)(A)(2)  The Coercive Encounter

On February 11, 2022, Special Agent Pfalzgraf (hereafter "**Pfalzgraf**") and Task Force Officer Villalona (hereafter "**Villalona**") went to the Home to

---

[3] "Child erotica" is material which "depict[s] children and [is] sexual in nature, but fail[s] to meet the statutory definition of child pornography."  *United State v. Vergara,* 884 F.3d 1309, 13114 (11th Cir. 2018).

"interview" Chavez.  A:90, 158.  The agents would later admit they *did not* have probable cause to arrest Chavez or apply for a search warrant at that time.  A:183.  Upon encountering Chavez, agents did not initially disclose the purpose of their visit.  A:161.  After less than one (1) minute of introductory conversation outside of the Home, the agents asked Chavez to move to the passenger seat of their unmarked vehicle.  A:160, 294.  The agents chose their vehicle as the venue for the interview because they wanted a quiet location to record that interview.  A:160, 184, 294.

They interviewed Chavez for approximately forty-eight (48) minutes.[4] A:184, 294.  As Magistrate Torres would later find, the audio of the encounter "speaks for itself."  A:295.  It captured verbatim the coercive statements which induced[5] Chavez's consent to a warrantless search.

The agents began the interview by telling Chavez he was not under arrest, and free to leave.  A:59.  The Government described "the tone of this interview as 'friendly' and 'relaxed.'"  However, Magistrate Torres found the opposite: Chavez was "a young man whose soft-spoken voice sounds confused, depressed, anxious,

---

[4] Chavez respectfully submits that the issues on appeal require review of the entirety of transcript of this encounter.  (That transcript appears at A:58-85.)  That being said, Chavez has attempted to highlight the most significant elements of the encounter.

[5] Audio confirms Chavez was not actually *asked* to provide consent to the warrantless search.  Rather, agents *informed* Chavez they would enter the Home to seize his devices.  Only after entering the Home, and seizing the devices, did agents performatively request consent.

and, by the end of the encounter, ultimately defeated." A:295. Agents told Chavez he would be arrested if he terminated the encounter. Magistrate Torres indeed found Chavez was subject to an involuntary custodial encounter. A:316.

Agents said if they could "clear this up today", they would "go about [their] business". A:59, audio 0:33. Pfalzgraf stated he knew the answers to questions he'd be asking and wanted to gauge Chavez' honesty. A:59, 296; audio 1:15. He then asked Chavez about his interests in photography, his internet usage, and the Riley photos. A:296. When Chavez provided answers not to the agents' satisfaction, Pfalzgraf said "[r]emember what we talked about man, when we started? I said I probably know some of the answers to these questions and I wanna gauge your honesty and how this is gonna go for you today." A:63, 296; audio 6:05. Pfalzgraf then repeated his questions.

"Throughout this portion of the interview, [Chavez] repeatedly told Pfalzgraf he did not know (or otherwise could not remember) the answers to Pfalzgraf's questions." A:297. But the agents persisted. Pfalzgraf reminded Chavez he was being evaluated for truthfulness, and said: "obviously you're nervous… I'm sure you mind's racing… the more candid you are with us now, the better off that this will end for you…. Your truthfulness isn't quite on point, to say the least." A:66, audio 10:48. As Magistrate Torres wrote, Chavez, "[a]bsorbing

6

these reminders, reluctantly elaborated" about the Riley photos and the electronic devices in his home. A:297.

As questions continued, Chavez said "**I can assume I'm being arrested**."[6] A:68, 297; audio 14:25. Pfalzgraf replied "**we were hoping to not to, depending on your cooperation** level, but right now, not necessarily getting that from you. **I was hoping we could look at your pictures you have, your devices, possibly take them with us and be on our way about our business**, but you haven't been the most forthcoming with us today, my man, and we're trying to be decent with ya." A:68, audio 14:25. Magistrate Torres found the agents were "[s]eizing upon Chavez's fear that he would be arrested…. Provided such a result occurred, Pfalzgraf insinuated that he and Villalona might depart without arresting Chavez" A:297.

Continuing to extremely personal questions, Agents inquired as to "pornographic preferences and sexual fetishes." A:297, 71; audio 19:51. When Chavez resisted, Pfalzgraf instructed him to answer. A:71, audio 20:24. Agents then shifted to Chavez's earnings related to the Riley photos. A:298. He'd previously acknowledged earning only $2.50 as an Amazon seller. A:72, audio

---

[6] Approximately fourteen (14) minutes into the forty-five (45) minute interview, Chavez first asked whether he was being arrested.

20:54.  Pfalzgraf challenged that number, but Chavez confirmed.  A:73, audio 23:29.

Pfalzgraf accused Chavez of "bullshitting", and said "it's Friday afternoon. **We don't wanna have to make an arrest right now**... **We'd much rather get cooperation from you,** if you'd be honest with us.  We can tell our prosecutor... 'He was honest with us.  He gave us everything he had.'  **We'll be on our way**." A:73, audio 23:43.  Magistrate Torres noted "Villalona giggled as Pfalzgraf reiterated that they would prefer Chavez cooperate because such cooperation would allow them to put in a good word about Chavez with their prosecutor." A:298.

Chavez responded "we both know how that's not how it works."  A:73, 298; audio 24:00.  Pfalzgraf persisted: "**That is precisely how it works**."  A:73, audio 24:03.  Distrusting that promise, Chavez responded "No."  A:73, audio 24:05. Pfalzgraf applied more pressure, saying "**there's potential that you don't go to jail today**." A:73, audio 24:20.  Indeed, Pfalzgraf repeatedly baited Chavez, saying minutes later: "I'm gonna keep **my end of the bargain** with you here if you continue to be honest." A:79, audio 34:12.

After nearly an hour, the agents made their most overt quid pro quo statement.  (As Magistrate Torres found, this is when "the bargain between Chavez and the FBI fully crystallized."  A:299.)  "By the 37-minute mark, an arrest was no

8

longer a potential activity that Pfalzgraf did not want to engage in; it was an activity that Pfalzgraf would carry out if Chavez refused to consent to the search." A:312. Pfalzgraf explicitly told Chavez that agents would either search the Home or arrest him.

Pfalzgraf said "we already... have a case built[7]... and **you don't wanna go to jail, right?** I don't wanna take you to jail... **But what I need to do in order to do that is... I am gonna need to get those devices that have those pictures**... **You can take a ride with Carlos tonight... or we can fill some paperwork if you consent to letting us take those devices** and look through em, and we're gonna go about our merry way, enjoy our weekend, and you can do the same...." A:81, audio 36:47. Pfalzgraf would later testify neither he nor Villalona ever used words like "may we search? Is it ok if we search? Can I have your permission to search?" A:186. Instead, he testified that "it was more matter-of-fact. 'This is what we need to do.'" A:186. In other words, the agents did not *ask* for consent to search the Home. They *informed* Chavez they *needed* to search the Home, and would arrest Chavez if he stood in their way.

Pfalzgraf then insinuated agents had the power to embarrass Chavez, saying "here's the other thing I'll tell you. Obviously, your mom and stepdad, we already

---

[7] The agents admit they had no probable cause to arrest Chavez or obtain a search warrant. A:183.

talked to them.   I didn't tell why we were trying to talk to you…. it's up to you what you tell them right?"  A:81, audio 38:22.  Immediately after, Pfalzgraf said: "So, I mean, **we're gonna have to go inside and leave with your devices**.  We're not gonna tell them what this is about."  A:81, audio 38:22.  Magistrate Torres, relying on Pfalzgraf's uncontradicted testimony and brief silence on the recording, found that Chavez nodded, and "non-verbally agreed with Pfalzgraf that this arrangement sounded fair."  A:299.

Never actually *asking* for consent, but having extracted it all the same, the agents went about the business of conducting what they presented as an inevitable search.  Pfalzgraf indicated agents would "fill out some paperwork" to "save some time inside".  A:82, audio 38:22.   He then completed a "Consent to Search Computer(s)" form ("**the Consent Form**").[8]  The Consent Form designates a space for law enforcement to list devices to be seized and searched.[9]  A:145.  Agents did not list devices in the designated space.  A:145.  Rather, Pfalzgraf wrote: "see back

---

[8] The Consent Form appears at A:145.

[9] It bears noting that the one page Consent Form does *not* attempt to memorialize consent to search real property like the Home, but only searches of electronic devices.  Chavez *never* signed a written consent to search the Home.

of page".[10]  A:145.  He then asked Chavez for passwords to devices which might be found in the Home.  A:83-84, audio 40:04 - 43:08.

Clearly uncomfortable, Chavez asked "[i]s there any way where I could, um, on my phone, get my lawyer's phone number?"  A:84, 300; audio 43:44. "[I]nstead of clarifying whether Chavez wanted to consult with his lawyer before consenting to a search, Pfalzgraf quickly pivoted back to the contents of the consent form…."  A:300.  Pfalzgraf said "[y]eah, absolutely.[11]  We want you to do all that and you're working with us, so I'll gladly work with you.  All right, so, **when we get inside,** I'll have to... note... the computer make, model, serial numbers and that.  **So I won't have you sign this till we go inside and I... fill that out.  But... this is your name, you've been asked by us for consent to search those devices, and... we'll collect those….**  Do you wanna read it? "  A:84, audio 43:59.  Again, Pfalzgraf did *not* ask Chavez for consent, but merely asked if he wanted an opportunity to review the paperwork, as though Chavez's consent was a foregone conclusion.

---

[10] The back of the page was annotated with a handwritten list of devices, signed by Pfalzgraf. A:144.  As those devices are identified by their serial numbers, it is clear the list was made *after* the search of the Home.  Villalona testified as such.  A:50, 199.

[11] Despite this response, Chavez was *never* permitted to contact his counsel, given access to his phone, or even given his counsel's phone number.

Chavez said "you both know that you guys are going to arrest me."  A:84, 300; audio 44:47.  Pfalzgraf responded:  "I'm not."  A:84, 300; audio 44:50.  Pfalzgraf elaborated, explaining that the photos they'd discussed are mere child erotica and "it doesn't really affect you in the grand scheme of thing."  A:84, 301; audio 44:53.  He finished by saying "we've got our hands full with too many of those case to probably even pursue anything like this." A:85, audio 46:32.  Shortly thereafter, prior to agents' entry to the Home, audio terminated.

### (II)(A)(3)  Warrantless Search of the Home

Having never actually *asked* for consent to search the Home, without obtaining written consent, and without a warrant, agents entered the Home.  Inside, they seized eleven (11) devices.  A:89, 91-92, 301.   The agents annotated the back of the Consent Form with the serial numbers of the devices.  A:198, 301.  Only then, *after* seizing and cataloguing the devices, did agents present Chavez with the Consent Form for signature.  A:50, 199.  Thereafter, agents searched the devices in what they describe in the Affidavit as a "**preliminary review**".  A:92-94.  On March 09, 2022, Chavez was arrested.  A:302.  At the time of his arrest, agents seized a final device- his iPhone 12.[12]  A:90.

---

[12] In all, the devices included a laptop, harddrives, SD cards, iPhone 7, iPhone 12, and a PlayStation.

## (II)(A)(4) Application for a Warrant

On March 16, 2022, more than a month after their encounter with Chavez, Villalona submitted the Affidavit.  A:86-122, 301.  Therein, Villalona sought permission to search the twelve (12) devices (which had already been searched).  A:100-110.  The bulk (if not all) of the incriminating information in the Affidavit was obtained from the "preliminary review" of the devices.  Stated differently, the Affidavit was comprised of the fruits of the warrantless search.

As probable cause, the Affidavit set forth the following:

- a description of Villalona's training and experience, A:88;

- a description of the complaint made to the FBI regarding the Riley photos, A:90;

- that the Riley photos were posted for sale on Amazon by "the company" Ghost Photography, A:90;

- that Ghost Photography is "a company owned" by Chavez and associated with his residence, A:90;

- that law enforcement spoke with Chavez in a "recorded, non-custodial interview", A:91;

- that Chavez stated he, since 2018 "has been selling photographs of teen models... but... that none would be considered child pornography", A:91;

- that Chavez knew of the minor in the Riley photos, "knows" the photographer who took the Riley photos (Grant), and "admitted to... helping the photographer promote his social media account", A:91;

13

- that "[a]t the conclusion of [the] interview", Chavez provided written consent to collect and search the eleven (11) devices seized from the home, A:91;

- that the laptop seized, accessed with a password provided by Chavez, contained child pornography and searches for child pornography, A:92-94;

- and that, based on the search of the laptop, agents arrested Chavez and seized Chavez's iPhone 12, A:89-90.

Not only did the Affidavit rely on the warrantless search, it was rife with omissions and misrepresentations. The most relevant examples are plain. Villalona wrote that the investigation began with "a report regarding the production of child sexual abuse material."[13]  A:91.  This despite acknowledging the Riley photos as child erotica to Chavez (and later the trial court)[14].  Villalona concealed the coercive nature of the encounter, especially as to promises Chavez would not be arrested if he provided information and/or consent.  Villalona

---

[13] The Government repeatedly argument that the term "child sexual abuse material" is synonymous with "child pornography".  A:251, 253, 255.  (Some, but not *all* "child sexual abuse material" would fit within Congress' definition of child pornography.  A:314.)  By labelling the Riley photos as child sexual abuse material, Villalona necessarily miscategorized them, as child erotica is never illegal to possess.

[14] Child erotica "does not meet the legal definition of child pornography, but depicts children in a manner intended to provide sexual arousal to individuals who are sexually attracted to children." *Thomas v. United States,* 775 Fed. Appx. 477, 480 (11th Cir. 2019).  Magistrate Torres correctly noted that "child sexual abuse material" is not necessarily "synonymous with 'child pornography' because the former term has not been defined by Congress."  A:314.  Child erotica is categorically *not* contraband.  *See* section (V)(C) *infra*.

neglected to mention never actually *asking* for verbal or written consent for the warrantless search, but rather informing Chavez that agents *needed to* enter and seize his devices.[15] Villalona neglected to mention that devices were seized *from inside the Home*.[16] Nor did he disclose that the Consent Form was signed *after* the devices were seized. These omissions concealed information which would cause a magistrate to question the free and voluntary nature of Chavez's consent.

Even the less significant portions of the Affidavit contained misrepresentations. Villalona exaggerated the significance of Ghost Photography, and Chavez's association thereto, calling it "a company owned by Chavez."[17] Similarly, Villalona exaggerated the nature of Chavez's connection to and interactions with Grant, the photographer of the Riley photos. Despite the Affidavit,[18] Chavez did *not* actually "know" Grant. Chavez never contacted Grant directly, but merely commented on a public post.[19]

---

[15] A:91, ¶11.

[16] A:91, ¶11.

[17] A:90.

[18] A:91.

[19] A:69-70; audio 17:27 – 18:10.

## (II)(B)  Procedural History

Chavez challenged the warrant in a Motion to Suppress, arguing the warrantless search was the product of a non-existent or coerced (and therefore invalid) consent.  [DE 28], A:29-57.   He further argued that the Affidavit contained falsehoods and omitted material information.[20]   Finally, he argued that, after removal of the fruits of the warrantless search, and adjustments to account for omissions and falsehoods, the Affidavit was void of probable cause.

The Motion was referred to Magistrate Judge Edwin G. Torres.  The Government filed a Response in Opposition to the Motion ("**the Response**").  A:123- 145, [DE 37].   In a Supplemental Memorandum, Chavez opposed the Government's argument that exigent circumstances excused the warrantless search.[21]   A:146-150, [DE 40].

---

[20] The Affidavit appears at A:86-122, [DE 28-3].

[21]As the issues addressed in that Memorandum did not inform the trial court's order under review, Chavez does not address them in this Initial Brief.  Should the Court take interest in this issue on *de novo* review, Chavez respectfully requests the opportunity to submit additional briefing.  Alternatively, Chavez would rely on the arguments presented in the aforementioned Supplemental Memorandum.

On October 31, 2022, Magistrate Torres conducted a hearing on Chavez's Motion.[22]   Magistrate Torres heard: testimony from Pfalzgraf[23] and Villalona,[24] and portions of the audio of the forty-eight (48) minute encounter.  At the hearing's conclusion, Magistrate Torres invited the parties to submit additional written argument on two (2) issues.

First, the parties were to brief whether the Riley photos could be classified as something more than child erotica, i.e. whether they could be viewed as child pornography.  A:261.   The Court invited that briefing because the Government argued that, even after excising the challenged material from the Affidavit, possession of the Riley photos provided probable cause. A:250.[25]   In that vein, the Court also allowed argument on whether the Affidavit contained probable cause with an independent source separate and apart from the warrantless search.  A:261.

On November 01, 2022, Chavez filed a Supplemental Memorandum. A:274-286, [DE 42].  Briefing the authorities defining the Riley photos as child erotica, *not* child pornography, Chavez argued the Affidavit offered no independent source

---

[22] A transcript of the hearing appears at A:151-291, [DE 41].

[23] Pfalzgraf's testimony appears at A:156-195.

[24] SA Villalona's testimony appears at A:195-201.

[25] The Court's discussion with the parties on this issue appears from A:250 – 260.

of probable cause.[26]  The Government filed a Memorandum arguing the contrary. [DE 43].

On November 03, 2022, Magistrate Torres issued a Report and Recommendations (hereafter "**the Recommendations**").  A:292-324, [DE 44]. Magistrate Torres' factual findings aligned with Chavez's recitation of facts. Additionally, Magistrate Torres identified the law advanced by Chavez as the controlling precedent.  He began by recognizing that:

> the audio recording clearly reveals that Chavez may have signed it in response to a *threat* that he would be arrested that afternoon and a *promise* that he would not be arrested that afternoon if he provided the Government with his consent, [thus] this written consent form is not dispositive of whether Chavez's consent was voluntary.

 A:305.  Thus, Magistrate Torres set about analyzing, pursuant to the touchstone *United States v. Spivey,* 861 F.3d 1207, 1213 (11th Cir. 2017), the voluntariness of Chavez's consent.

Magistrate Torres first questioned whether agents' bargain with Chavez amounted to "deceit" or "trickery".  A:306.  He found Chavez's consent was the product of the quid pro offer by agents.  A:306.  His Honor found that said "bargain weighs against the Government" under the totality of the circumstances.

---

[26] As the issues addressed in that Memorandum did not inform the order under review, Chavez does not address them herein.  Should the Court take interest in this issue on review, Chavez respectfully requests the opportunity to submit additional briefing.  Alternatively, he relies on the arguments presented in the aforementioned Supplemental Memorandum.

A:306.  However, because the threat of arrest was not simply an empty one,[27] the threat "weighs less heavily against the Government… than if the threat had been utterly baseless."  A:316.

Magistrate Torres next found that at the time consent was rendered, Chavez was subject to an involuntary custodial encounter.  A:316.  His Honor reasoned that agents presented Chavez "with an unambiguous choice" to consent or be arrested.  A:306.  As to said "agreement", "the terms were indisputedly clear: in exchange for Chavez's consent to allow the Government to seize and search his electronic devices… [the agents] would not arrest Chavez that afternoon."  A:307.  Magistrate Torres found "it is hard to conclude that a reasonable person would feel free to leave after that threat."  A:317.  Instead, Chavez "had two options: consent to the requested search or immediately endure the pain of a formal arrest.  When presented with those options, no reasonable person could feel that he was free to exit the vehicle unless he gave the agents exactly what they wanted."  A:317.  Thus, "this factor suggests that Chavez's consent was not the product of a free and voluntary choice."  A:317.

---

[27] In so finding, Magistrate Torres discussed whether possession of the Riley photo subjected Chavez to arrest.  He noted that agents: did not submit (but merely described) the photo; testified that it was child erotica (not child pornography); and did not label the photo as child pornography. Nonetheless, the threat of arrest was not "wholly unjustified" where an officer "could have reasonably believed that he could have legitimately arrested Chavez".  A:306-316.

19

Magistrate Torres found that agents used two additional coercive practices. A:317.  Agents "presented the interview as an honesty test", which is significant because "it is a crime to lie to an FBI agent."  A:318.  Agents also "took affirmative steps to prevent Chavez from interacting with others during his decision-making process."  A:318.  (Magistrate Torres was referring to Chavez's parents and attorney, the latter of whom Chavez sought to consult during the encounter.  A:318.)  These coercive practices weighed against consent, but not "heavily".  A:318.

Chavez's knowledge that incriminating evidence would be found on his devices suggested consent was not given voluntarily, but because "he felt that he really did not have a choice."  A:321.  Magistrate Torres found Chavez "could not have reasonably believed that no incriminating evidence would be found on" the devices.  A:321.

Weighing in favor of consent was Chavez's cooperativeness after being greeted by agents, as was his knowing waiver of his right to refuse consent, and his intelligence.  A:319-320.  Magistrate Torres noted Chavez was never explicitly informed of his right to refuse, but concluded, under the totality, that he was aware of that right. A:320.

Synthesizing the foregoing, Magistrate Torres concluded this "is certainly one of those cases" where an inquiry into the totality of the circumstances presents

20

"difficult balancing equation for courts to calculate." A:322. Ultimately, he found Chavez's "will was not overborne" by the agents. He did so in a sharp turn over a *single* paragraph, after a nineteen (19) page review of the precedent requiring otherwise. His Honor tipped the scales with findings that agents: "threat to arrest Chavez if he did not consent was not unjustified, and because the other coercive aspects of the encounter were minimal relative to other Eleventh Circuit cases that held consent to be voluntary…." A:322-323. (Those cases, supplied by the Government and neither comparable nor binding, were not fully explored by Magistrate Torres, but string-cited in the final page of the Recommendation. A:323.) Ultimately, Magistrate Torres recommended denial of the Motion. A:324.

Chavez filed Objections to the Recommendations (hereafter "**the Objections**"). A:325-349, [DE 48]. In his Objections, Chavez found himself in an unusual position. He urged Judge Gayles to: accept Magistrate Torres' factual findings and identification of the relevant law; but, overrule the *interpretation* of that law, and recommendation that the Motion be denied. A:327.

Judge Gayles conducted a hearing on the Objections. [DE 60]. Thereafter, Judge Gayles instructed the parties to brief the sufficiency of any consent to search, particularly whether a non-verbal nod of the head may constitute consent to search. (The sufficiency of non-verbal consent was *not* an issue raised by either

21

party, or by Magistrate Torres in the Recommendation.[28]  Rather, it was an issue of interest to and raised *sua sponte* by Judge Gayles.)

Chavez submitted a Memorandum as requested.  A:350-357, [DE 63].  He noted, as a preliminary, that a nod could not have been made in response to a request to search because the agents testified they never actually *asked* for such consent.  Speaking more directly to the Court's question, Chavez argued that the form of consent (be it in words or non-verbal gestures) was not at issue.  Rather, he emphasized that *any* consent must be voluntary and not the product of coercion. The Government also submitted a Memorandum.  A:358-365, [DE 64].

On May 03, 2024, Judge Gayles conducted a Calendar Call.  A:366-373, [DE 109].  His Honor stated: "I really went back and forth on this one… and having reviewed everything… I am going to adopt Judge Torres' report and recommendation."  A:369.  In so ruling, Judge Gayles explained: "the primary issue that I had was, of course, the issue that I had you brief… the case law is pretty clear that consent can be nonverbal….."  A:370.  In other words, Judge Gayles found that a consent had been rendered, but **never reached the issue at the heart of the Motion**: whether that consent was voluntary, and therefore valid.

---

[28] Chavez's challenge to the validity of his consent relates to coercion and voluntariness, *not* the manner of consent.  Nor did Magistrate Torres' Recommendation hinge upon the nonverbal nature of any consent.

The following day, Judge Gayles entered a concise Order adopting the Recommendations.  A:374-376, [DE 68].  After briefly reviewing the procedural history and the standard for review of a report and recommendation, Judge Gayles wrote: "[h]aving conducted a *de novo* review of the record and having considered the *Spivey* factors, the Court agrees with Judge Torres' well-reasoned analysis and conclusion that, based [on] the totality of the circumstances, Defendant Douglas Chavez's consent was voluntary."  A:376-7.   The Recommendation was then affirmed, adopted, and incorporated by reference.  A377.  The Court did *not* overrule any of Magistrate Torres' findings.  (**In other words, Magistrate Torres, Judge Gayles, and Chavez, were all in agreement on the relevant facts**.)

On July 27, 2023, Chavez entered a plea of guilt, preserving his right to appeal the denial of the Motion.[29]  A:377-382, [DE 74].  On November 21, 2023, Judge Gayles sentenced Chavez to sixty (60) months of imprisonment, to be followed by ten (10) years of supervised release.  A:383-391, [DE 91, 96].

A timely notice of appeal was filed on November 27, 2023.  A:392-394, [DE 97].  This court reviews for clear error the trial court's findings of fact.[30]  *United*

---

[29] Pursuant to the written plea agreement, the parties agreed that the Motion is dispositive, and that "should the defendant prevail on appeal" he would "be allowed to withdraw/vacate his plea…."  [DE 74] at ¶8, A:381-382.

[30] Chavez does not challenge the trial court's findings of facts, and believes those facts weigh heavily in favor of reversal.

*States v. Freeman*, 2011 U.S. App. LEXIS 17902, 1 (11th Cir. 2011).  The trial court's application of law to those facts is reviewed *de novo*.  *Id.*

## IV.  SUMMARY OF ARGUMENT

Chavez appeals the denial of his Motion to Suppress.  Motions to suppress present mixed questions of law and fact; a trial court's factual findings are reviewed for clear error, and the application of law to those facts is reviewed *de novo*.  *United States v. Freeman*, 2011 U.S. App. LEXIS 17902, 1 (11th Cir. 2011).  The voluntariness of consent is a question of fact typically subject to clear error review.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973).  However, where (as here) there is no dispute of fact, the determination as to the voluntariness of consent is reviewed *de novo*.  *United States v. Garcia,* 890 F.2d 355, 360, note 5 (11th Cir, 1989).  Thus, the Court "will review the [trial] judge's find of voluntariness *de novo* and determine whether… consent was voluntary."  *Id.*

In his Motion, Chavez challenges the issuance of a warrant in reliance on the fruits of a prior warrantless search of his Home.  The prior warrantless search was conducted pursuant to Chavez's purported consent.  However, the undisputed facts show Chavez did not freely and voluntarily consent.  For nearly forty (40) minutes, agents subjected Chavez to an involuntary encounter, pressuring him to the point of defeat.  Agents never asked for consent, but informed Chavez that a search "needed" to occur.  Finally, they bargained with and offered him a clear exchange:

24

if he consented to the search, he would not be arrested that day.  Under these circumstances, Chavez did not freely and voluntarily consent to the warrantless search.

The Affidavit's offer of probable cause is further diminished by adjustments to offset misrepresentations and omissions of material facts, agents' misrepresenting the encounter and the facts surrounding Chavez's consent, and Chavez's connection to the Riley photos.

After removing the fruits of the unlawful warrantless search and adjusting to correct misrepresentations and omissions, the Affidavit is void of probable cause. Finally, where misconduct is demonstrable, and the Affidavit was void of probable cause, the good faith exception cannot salvage the fruits of the search.

# V.  ARGUMENT

Where a magistrate's decision to issue a warrant is challenged, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding that probable cause existed.'" *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)).  This review is made using only the information contained within the Affidavit's "four corners". *Id.  See also United States v. Williams,* 177  Fed. Appx. 914, 917 (11th Cir. 2006)

25

(a reviewing court evaluates "the information that was before the issuing court, generally in the form of an affidavit from an investigating officer.")

Observations from an unlawful search cannot be used to establish probable cause for a warrant. *United States v. Noriega,* 676 F.3d 1252, 1260 (11th Cir. 2012). Issuance of a warrant "does not sanitize an otherwise illegal search." *United States v. Holley,* 831 F.3d 322 (5th Cir. 2016). When a "search warrant affidavit is based on information acquired as a result of an illegal entry, [the reviewing court] must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding." *United States v. Chaves,* 169 F.3d 687, 692 (11th Cir. 1999). Stated differently, the reviewing court looks for an "independent source" of probable cause, not based on the "initial warrantless entry that arguably violated the Fourth Amendment…." *Noriega,* 676 F.3d at 1260.[31]

If an affidavit contains information that was false, unlawfully obtained, or improperly relied upon by the magistrate, the trial court must conduct a "Franks hearing." *See Franks v. Delaware*, 438 U.S. 15 (1978). *Franks* "requires an evidentiary hearing when a defendant makes a substantial preliminary showing that statements or omissions made in an affidavit supporting a [warrant] are

---

[31] Pursuant to the "independent source doctrine", a reviewing court ensures both that a warrant was neither issued nor sought on the basis of observations made during a prior unlawful search. *United States v. Chaves,* 169 F.3d 687, 692 (11th Cir. 1999).

26

deliberately false or made with reckless disregard for the truth." *United States v. Goldstein,* 989 F.3d 1178, 1197 (11th Cir. 2021).   After a Franks hearing, the trial court: excises from the affidavit any false or unlawfully obtained information; supplements the affidavit with any intentionally omitted information; and determines whether "probable cause still exists…." *United States v. Gamory,* 635 F.3d 480, 490 (11th Cir. 2011).  In other words, the reviewing court determines whether the affidavit actually established probable cause to search.

Here, **(A)** the warrantless search of the Home was made in the absence of a *voluntary* consent.  Accordingly, the warrantless search was unlawful, and its fruit must be excluded from this Court's review of the Affidavit.  Further adjustments to the Affidavit must be made **(B)** to offset the agents' omissions and misrepresentations.   Evaluated after those adjustments, **(C)** the Affidavit is void of probable cause.  Finally, **(D)** the good faith exception will not save the evidence at issue.

### (V)(A) Fruits of the Warrantless Search Must be Excised from the Affidavit

The following **(1)** review of the caselaw defining a voluntary (and therefore valid) consent, will demonstrate that **(2)** Chavez did not voluntarily consent to the warrantless search.  Thus, the fruits of the warrantless search must be excised from the Affidavit.

### (V)(A)(1) Consent: An Overview of Voluntariness

27

The search of a home "conducted in the absence of a search warrant is, usually, presumptively unreasonable." *United States v. Yarbrough,* 961 F.3d 1157, 1163 (11ᵗʰ Cir. 2020). "Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth amendment protection." *United States v. McGough,* 412 F.3d 1232, 1237 (11ᵗʰ 2005). "'At the Fourth Amendment's very core stands the right of a man to retreat to his home and there be free from unreasonable governmental intrusion.'" *Kentucky v. King,* 131 S. Ct. 18849, 1865 (2011) (citing *Brigham City v. Stuart,* 547 U.S. 398, 404 (2001)). It follows that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" *Payton,* 445 U.S. at 586.

"[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment…." *Katz v. United States,* 389 U.S. 37, 357 (1967). Where the search of a home is conducted without a warrant, the Government must prove the search falls within an exception to the warrant requirement. *Id.* Here, the Government relied upon the consent exception.

This exception requires not simply the existence of a permissive, but a *voluntary* one. Where "the validity of a search rests on consent, the [Government] has the burden of proving that the necessary consent was obtained **and** that it was freely and voluntarily given, a burden that is not satisfied by showing a mere

28

submission to a claim of lawful authority." *Florida v. Royer,* 460 U.S. 491, 497 (1983) (emphasis added). "The contours of valid consent are fairly well-established when it comes to searched of private dwellings by law enforcement officers. In that context, [the Courts] have been reluctant to 'sanction entry into the home based upon inferred consent.'" *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021) (citing *United State v, Gonzalez,* 71 F.3d 819, 830 (11th Cir. 1996). Consent cannot be presumed "merely because the homeowner fails to verbally or physically object to [an officer] entering the home." *Id.*

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.' In seeking consent, police must "not convey a message that compliance with their requests is required." *Florida v. Bostick,* 501 U.S. 429, 435 (1991). Consent is coerced when, "by explicit or implicit means, [procured] by implied threat or covert force. For, no matter how subtly the coercion [is] applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.'" *Id.* at 228. "Coercion is determined from the perspective of the subject." *Spivey,* 861 F.3d at 1215.

Voluntariness is 'not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis' that is based on 'the totality of the circumstances.'" *United States v. Spivey,* 861 F.3d 1207 (11th Cir. 2017)

(citing *United States v. Purcell,* 236 F.3d 1274, 1281 (11ᵗʰ Cir 2001)).  The

Government bears a heavy burden in proving consent to search was not coerced.

*United States v. Tobin,* 923 F.2d 1506, 1517 (11ᵗʰ Cir. 1991).

A court evaluating the voluntariness of consent **looks principally to the**

**nonexhaustive list of factors set forth in *Spivey,*** including:

> the voluntariness of the defendant's custodial status, the presence of coercive
> police procedure, the extent and level of the defendant's cooperation with
> police, the defendant's awareness of his right to refuse to consent to the
> search, the defendant's education and intelligence, and, significantly, the
> defendant's belief that no incriminating evidence will be found.

861 F.3d at 1213 (citing *United States v. Chemaly,* 741 F.2d 1346, 1352 (11ᵗʰ Cir.

1984)).  A court also considers whether officers "promised [a defendant] anything

in exchange for her consent."  *United States v. Pupo-Reynaldo*, 470 F. App'x 873,

875 (11th Cir. 2012).[32]

On review, "the question of whether a consent to a search was in fact

'voluntary' or was the product of duress or coercion, express or implied, is

[**ordinarily**] a question of fact to be determined from the totality of all the

circumstances."  *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). (Emphasis

---

[32] *See also United States v. Long,* 866 F.2d 402, 404 (11th Cir. 1989); *United States v. Grant,* 689 F. App'x 935, 938 (11th Cir. 2017) (consent was voluntary where officers did not promise anything in exchange for consent to search a cellular phone)*; United States v. Jaimez,* 571 F. App'x 935, 937 (11th Cir. 2014) (consent was voluntary when officers made no threats or promises); *United States v Grant,* 689 Fed. Appx. 935, 939 (11ᵗʰ Cir. 2017) (noting officers did not promise anything to encourage consent).

added.)  *See also Ohio v. Robinette,* 519 U.S. 33, 40 (1996).  Stated more particularly, the *factual findings* which *inform* a trial court's determination of voluntariness are entitled to great deference, to be disturbed only for clear error. *Spivey,* 861 F.3d at 1212.  "But [this Court] will review *de novo* the district court's application of the law about voluntariness to uncontested facts."  *Id.*  Where (as here) there is no dispute with respect to the facts, this Court is "in as good a position as the district court to apply the law to the uncontroverted facts."  *United States v. Garcia,* 890 F.2d 355, 360, note 5 (11th Cir, 1989).   Thus, the Court "will review the [trial] judge's find of voluntariness *de novo* and determine whether… consent was voluntary."  *Id.*

### (V)(A)(2) Chavez Did Not Voluntarily Consent
### to the Warrantless Search

This Court regularly reviews claims of coerced consent, yet rarely are the facts advanced by an appellant readily confirmed in audio recorded by the police themselves.  Here, because of the audio, there is no dispute regarding the nature of the encounter.  Chavez agrees with the Magistrate's findings of fact,[33] and challenges only the legal determination that his "will was not overborne…"[34]

---

[33] The Court need not make any credibility determinations, nor review any finding of fact.  The parties agree on the facts of the encounter.  A:295.

[34] A:322.

31

Thus, the trial court's classification of the encounter as voluntary is subject to *de novo* review. The aforementioned authorities mandate a finding that Chavez's consent[35] was not freely and voluntarily rendered.

**Spivey instructs this Court first consider the voluntariness of Chavez's custodial status.** As the trial court found, Chavez was involuntarily detained at the time of his consent. Agents plainly and repeatedly informed him that if he refused consent, he would be arrested. The trial court recognized that agents presented Chavez "with an unambiguous choice" to consent or be arrested.[36] As to said "agreement", "the terms were indisputedly clear: in exchange for Chavez's consent … [the agents] would not arrest Chavez that afternoon."[37] Chavez "had two options: consent to the requested search or immediately endure the pain of a formal arrest. When presented with the option of arrest or consent, no reasonable person could feel that he was free to exit the vehicle unless he gave the agents exactly what they wanted."[38] As the trial court found, Chavez was subject to an involuntary detention.

---

[35] Chavez eventually nodded in response to the agents' statements that they would seize the devices. The trial court viewed the nod as a signal of consent, a finding Chavez does not challenge.

[36] A:306.

[37] A:307.

[38] A:317.

The **second *Spivey* factor, the presence of coercive police procedures**, also merits a finding of involuntariness.   As the Supreme Court explained in *Bostick,* police cannot extract consent by even the *implication* that compliance is required.  501 U.S. at 435.  Here, agents presented seizure of the devices as an inevitability, rather than an intrusion contingent upon consent.  It is undisputed that agents never actually *asked* for consent.   Pfalzgraf testified that neither he nor Villalona ever used words like "may we search?  Is it ok if we search?  Can I have your permission to search?"[39]  Instead, their words were "more matter-of-fact. 'This is what we need to do.'"[40]   Agents told Chavez they "need[ed] to get those devices", and that they "ha[d] to go inside and leave with [the] devices."[41]  Agents *informed* Chavez they would seize the devices, and described their entry to the Home as obligatory.

Pfalzgraf's words would lead any reasonable person to conclude the search of the Home would happen with *or* without consent, the only difference being that consent would preclude arrest.  Indeed, agents explained that if they were not allowed to seize the devices, Chavez would be arrested.

---

[39] A:186.

[40] A:186.

[41] A:81.

33

Agents repeatedly threatened Chavez with arrest, in a pattern of increasingly egregious, coercive statements, culminating in (what Pfalzgraf described to Chavez as) a bargain.[42] **"You can take a ride with Carlos tonight... or we can fill some paperwork if you consent to letting us take those devices** and look through em, and we're gonna go about our merry way, enjoy our weekend, and you can do the same...."[43]  As Magistrate Torres reasoned, Chavez "had two options: consent to the requested search or immediately endure the pain of a formal arrest."[44]

Agents used the bargain to unlawfully overcome Chavez's opposition to the search.  Police may not promise a defendant anything in exchange for consent. *Pupo-Reynaldo*, 470 F. App'x at 875.  Consent is *never* free and voluntary when given in exchange for such a benefit.  The *quid pro quo,* alone, renders Chavez's consent involuntary as no reasonable person would feel free to decline consent.

The trial court considered the repeated threats of arrest and acknowledged their coercive nature.  It also decided the threats weigh less heavily towards involuntariness because, it reasoned, those threats were actionable.  Stated differently, the trial court found a threat of arrest is heavily coercive only where it amounts to "trickery".  In this respect, the court erred on a matter of law.

---

[42] A:79, audio 34:12.

[43] A:81, audio 36:47.

[44] A:317.

Magistrate Torres relied on the readily distinguishable *United States v. Long,* 866 F.2d 402, 405 (11th Cir. 1989). The *Long* Court found it was not unduly coercive for officers to threaten to obtain a warrant if the defendant refused consent to a search. However, this Court so held ***because*** the defendant "was not promised that he would not be prosecuted. In fact, [he] was the one who first insinuated that he would be willing to cooperate if the agent would help him out; it was not the agent who offered such an arrangement." *Id.* Moreover, the *Long* defendant cooperated "without any request or promise on the part of the officers...." *Id.*

The defense is unaware of any authority which holds that an officer's actionable threat to arrest is less coercive. Moreover, agents' ability to execute Chavez's arrest does not speak to the coercive effect of those threats. Rather, the threat of arrest was coercive because, as is readily apparent from the audio, Chavez *believed* he would be arrested if he did not consent. As a layperson, Chavez was incapable of determining whether the threat to arrest was empty.[45] ("Coercion is determined from the perspective of the subject." *Spivey,* 861 F.3d at 1215.)

---

[45] This point is underscored by need for dozens of pages of briefing and opinion analyzing the encounter. Even the Government concedes it cannot represent that agents had probable cause to execute Chavez's arrest. (The trial court asked the Government whether, in hindsight, it would have arrested Chavez for possession of the Riley photos. The Government responded that it was merely "possible. But... to be candid... to be completely honest... I cannot, on my own, right now standing here before the Court, tell you that I can—that I would have authorized that arrest.... I can't stand here today and say I would have [said]- there's definitely probable cause to arrest...." A:254.)

35

Nonetheless, to the extent this Court might find an actionable threat less coercive than an empty one, Chavez disagrees with the trial court's legal determination that the threat of arrest was actionable. Magistrate Torres determined it was "arguable" agents *might* have had probable cause to arrest Chavez because there was a *possibility* the Riley photos could be classified as child pornography rather than child erotica.[46]  That possibility is immaterial here, as the agents testified they did not believe they had probable cause to arrest, and would not have arrested Chavez. Thus, it is clear their threats *were* empty, and designed to extract consent.

Those threats were not the only coercive practice employed by agents. Also coercive was the nature of the custodial interrogation. By the time Chavez acquiesced, he'd been subjected to at least thirty-eight (38) minutes of questions designed to illicit incriminating responses. Some were alarmingly personal, relating to Chavez's sexual proclivities and "fetishes". Moreover, agents repeatedly pressured Chavez to change or elaborate on his responses. When he was reluctant, or provided information agents deemed insufficient, agents accused Chavez of "bullshitting".[47]  They "presented the interview as an honesty test"

---

[46] Chavez vehemently disagrees with the same; the Riley photos most be viewed as child erotica. Agents repeatedly referred to the images as child erotica, and the photos were never introduced. *See* Supplemental Memorandum. A:274-286, [DE 42].
[47] A:73, audio 23:43.

36

which, as acknowledged by the trial court, is significant because "it is a crime to lie to an FBI agent."[48]   Agents told Chavez they'd rather "get cooperation" than make an arrest.[49]   ("Villalona giggled as Pfalzgraf reiterated that they would prefer Chavez cooperate because such cooperation would allow them to put in a good word about Chavez with their prosecutor.")[50]   Faced with the threat of arrest for the mere refusal to provide *information*, no reasonable person would feel free to decline a request for *consent*.

Also coercive was agents' insinuation that, if Chavez impeded their search, they might embarrass him.  Immediately after threatening him with "a ride", Pfalzgraf said: "here's the other thing I'll tell you.  Obviously, your mom and stepdad, we already talked to them.   I didn't tell why we were trying to talk to you…. it's up to you what you tell them right?"[51]  This comment sheds further light on the agents' isolation of Chavez from his parents, an element the trial court found to be indicative of coercion.

Magistrate Torres acknowledged that agents "took affirmative steps to prevent Chavez from interacting with others during his decision-making

---

[48] A:318.

[49] A:73, audio 23:43.

[50] A:298.

[51] A:81, audio 38:22.

process."[52]   His Honor reasoned that if Chavez had been interviewed at his doorstep, rather than the confines of a police vehicle, there was a "tangible risk" his mother might, "to protect" Chavez, tell him to "stop speaking" with agents.[53] Isolating Chavez from his parents not only precluded them from interfering, but was an additional stick (or at least a carrot) to coerce consent.

Likewise, the trial court acknowledged the isolation of Chavez from his attorney.  Before agents search the Home, Chavez asked to access his phone for his attorney's phone number.  While agents perfunctorily said they would allow that, they didn't, and immediately returned to the business of filling in the Consent Form.[54]  Agents' brushoff of Chavez's request to communicate with counsel added another layer of coercion.

The **third *Spivey* factor, Chavez's cooperation with police**, is not instructive where cooperation was exacted through agents' pervasive coercion. (Caselaw evaluating cooperativeness relates to fact patterns where defendants are cooperating long before coercion enters the picture.)  As Judge Torres found,

---

[52] A:318.

[53] A:318.

[54] Magistrate Torres, despite acknowledging the same as coercive, found it not to be *heavily* so because the agents "Pfalzgraf said that he would 'gladly' permit" Chavez to access his phone A:319.  That analysis overlooks the emptiness of Pfalzgraf's words.  Chavez was *not* given access to his phone, nor was he given a chance to contact his lawyer.

Chavez's cooperation was induced through coercion. Chavez's "soft-spoken voice sounds confused, depressed, anxious, and, by the end of the encounter, ultimately defeated." A:295.

**_Spivey_ instructs the Court to look next to Chavez's awareness of his right to refuse consent.** Chavez was surprised Magistrate Torres' found Chavez was aware of his right to refuse consent. That finding is completely at odds with, and belied by, an earlier finding that no reasonable person would feel free to terminate the encounter "**unless he gave the agents exactly what they wanted**… [Chavez was] at liberty to go only one of two places- inside his home with the agents in tow or to the back seat of the police cruiser, where he would remain until he arrived at the local jail." [55] (It bears repeating: these words were written not by the trial court, not the defense.) If no reasonable person would feel free to terminate an encounter without consenting, it follows no reasonable person would be aware of the right to refuse consent. The coercive threats to arrest vitiate the possibility Chavez was aware of his right to refuse consent.

The only _Spivey_ **factor** which does not weigh heavily against the Government is **Chavez's education and intelligence**. Nothing in the record

---

[55] A:317.

suggests Chavez is generally without the minimum education and intelligence required to make voluntary decisions.

The **final *Spivey* factor** due consideration by this Court is **whether Chavez believed incriminating evidence would be found** during the seizure.  Interpreting this factor, the Fifth Circuit explained a defendant's "belief that no incriminating evidence [will] be found is a factor pointing to the validity of his consent.  Believing he [has] nothing to hide, he [has] nothing to gain by refusing to consent to the search."  *United States v. Hall,* 565 F.2d 917, 921 (5th Cir. 1978).  This factor confirms consent was not freely and voluntarily rendered, as Chavez knew incriminating evidence would be found inside the Home.

By the time agents wrenched out his consent, they'd made painstakingly clear they were looking for child pornography.  Chavez was undoubtedly aware said contraband would be found on his devices.  Where he repeatedly expressed his fear of arrest and personal ruin, he would not have consented to the search unless he believed consent to be compulsory.  So recognized the trial court, which found "this factor indicates Chavez's consent was involuntary because he presumably knew that incriminating evidence would be found" during the search

of his Home.[56]  Magistrate Torres reasoned Chavez "consented to the search not because he wanted to but because he felt that he really did not have a choice."[57]

Suprisingly, after writing those words, Magistrate Torres recommended denial of the Motion.  That finding alone, without regard to any other *Spivey* factors, is dispositive.  (Knowledge that contraband would be found is the only factor singled out by *Spivey* as holding "significant" weight.  861 F.3d at 1213.) Yet the *totality* of Magistrate's Torres' factual findings weigh so heavily in favor of suppression under *Spivey* that, until reaching the very end of the Recommendation, counsel was convinced that the word "denied" appeared on the first page because of a typo.

In a single paragraph spanning less than a page, Magistrate Torres offered two reasons for denial.   He cited first, his finding that threats to arrest were "not unjustified, and [second, that] the other coercive aspects of the encounter were minimal relative to other Eleventh Circuit cases that held consent to be voluntary...."[58]   Thereafter Magistrate Torres string cited (but did not analyze) several cases advanced by the Government, and recommended the Motion be denied.

---

[56] A:321.

[57] A:321.

[58] A:322-323.

Neither of those reasons justify the finding that Chavez's consent was voluntary. As previously argued, it is of no significance, whatsoever, that agents' threats to arrest Chavez are, now, theoretically justifiable. Agents testified they did not believe they had probable cause to arrest Chavez, and would not have arrested Chavez. More importantly, the potential legality of arrest is irrelevant to the coercive effect of threats to arrest because Chavez undisputedly *believed* he would be arrested unless he granted consent. This Court has already determined that consent may not be extracted by way of a promise or bargain. Thus, the trial court erred by considering whether the threats of arrest were actionable.

The court likewise erred by relying on the cases listed in string cite. Not one of those cases is applicable. *United States v. Espinosa-Orlando,* 704 F.2d 507 (11th Cir. 1983) was cited for the proposition that consent to search a vehicle was voluntary despite officers pointing a gun at a defendant. But officers in *Espinosa-Orlando* only momentarily engaged in that *single* coercive tactic (briefly drawing, and then holstering their weapons) before requesting consent. *Id.* at 513. That encounter was not, as in the case at bar, rife with significant and omnipresent coercion during a lengthy encounter. Nor was there, as here, undisputed evidence of multiple *Spivey* indicia of involuntariness.

*Espinosa-Orlando* is further distinguishable in that it addressed the search of a vehicle. It is axiomatic that a lesser expectation of privacy exists in a vehicle

42

(exposed to public view), than a home (subject to the greatest of Fourth Amendment protections).   The circumstances which render involuntary consent to search a vehicle need be *far* more egregious that those which would invalidate consent to search a home.  Finally, *Espinosa-Orlando* was constrained by clear error review, rather than the *de novo* standard at bar.  *Id.* at 513.  Thus, it is not so much a finding of voluntariness, as a finding there was no clear error justifying reversal.

Magistrate Torres also cited the inapplicable *United States v. Long,* 866 F.2d 402, 405 (11th Cir. 1989) for the proposition that consent was voluntary despite a threat to destroy a defendant's yard.  Prefatorily, arrest is far more coercive a threat than to damage foliage.  Moreover, *Long* relied heavily on the fact that, unlike here, the defendant "was the one who first insinuated that we would be willing to cooperate if the agent would help him out; it was not the agent who offered such an arrangement."  *Id.*  Finally, the *Long* defendant cooperated "without any request or promise on the part of the officers...."  *Id.*

Magistrate Torres also listed *United States v. Garcia,* 890 F.2d 355 (11th Cir. 1989).  There, officers threatened to apply for a warrant where the defendant granted only partial consent.  The *Garcia* defendant was already under arrest when officers made that threat.  Moreover, this Court relied on the fact that officers never represented an authority to obtain a warrant.  *Garcia* is readily

43

distinguishable here, where agents repeatedly and affirmatively stated that they *would* arrest Chavez if he did not consent.

Also cited in the Recommendation was *Tukes v. Dugger,* 911 F.2d 508 (11th Cir. 1990). The facts of *Tukes* are inapplicable to the case at bar. There, the defendant claimed his consent was coerced by virtue of his limited intelligence. Chavez's does not allege limited intelligence or understanding. (Lack of intelligence is the *only Spivey* factor on which Chavez does not rely.) Moreover, the coercion readily apparent in this case was not present in *Tukes.*

Finally, Magistrate Torres cited *Spivey* itself, for the proposition that consent was voluntary even though police gained access to a home through deception. In *Spivey,* an officer responded to a burglary. *Spivey,* 861 F.3d at 1215. The officer did not disclose to the defendant his dual intent of investigating a report of an ongoing crime at the same address. *Id.* This "minor deception" did not, under the clear error standard, warrant reversal. *Id.* In other words, police in *Spivey* did not, as did the agents here, engage in a pattern of coercive pratices.

Citing no *applicable* authority to support a finding of voluntary consent, the Recommendation's conclusion is at odds with its own factual findings and relevant law. The cited authorities, and the Fourth Amendment, require consent to be the product of a free and voluntary choice. *Spivey*, applied to the undisputed factual findings, mandates suppression. Chavez was interrogated during a lengthy

44

custodial encounter presented as an honesty test.  He was segregated from his family, and counsel (to whom he requested acccess).  He was repeatedly told he would be arrested if he did not consent.  This coercion precluded an understanding of the right to refuse consent.  (In a textbook example of involuntariness, the court found he "consented to the search not because he wanted to but because he felt that he really did not have a choice."[59])   Agents promised Chavez he would not be arrested that day if he consented. Agents themselves referred to this *quid pro quo* exchange as a "bargain".  Finally, and as *Spivey* identifies as signficant, Chavez knew any search would uncover incriminating evidence.

Respectfully, the question of voluntariness in this case is not a close one. Almost every *Spivey* factor demonstrates a lack of voluntariness.   Where consent was so readily documented as the product of coercion, it cannot be construed as freely and voluntarily given.  (It bears consideration that Judge Gayles, in adopting the Recommendation, did not seem to consider *Spivey* at all.  He unambiguously indicated that his "primary" concern was not the voluntariness of consent, but rather whether consent can be rendered nonverbally via a nod.)  In the absence of a valid consent, the warrantless search violated the Fourth Amendment, and the existence and contents of the devices must be excluded from review of the Affidavit.

---

[59] A:321.

## (V)(B) The Affidavit Contains, and Must be Adjusted to Offset, Agents' Misrepresentations and Omissions

Excision of the fruits of the warrantless search is, alone, fatal to the Affidavit's probable cause submission.  Yet the Affidavit is also subject to additional adjustments.  *Franks* requires the Court to consider the Affidavit in light of the intentional falsehoods and omissions of the agents (of which there is no shortage). [60]

Attempting to establish probable cause, agents wrote in the Affidavit they learned of Chavez from "a report regarding the production of child sexual abuse material."  What Villalona withheld, however, is that agents later learned the report related to the Riley photos.  As agents readily admitted, the Riley photos are not child pornography or child sexual abuse material, but child erotica.

More importantly, Villalona concealed the coercive nature of the encounter. Agents were exceptionally withholding in their recitation.  The encounter is described in a single paragraph comprised of just four (4) sentences,[61] *none* of which reference agents' multiple quid pro quo inducements or other coercive tactics.  Villalona affirmatively misrepresented that Chavez consented to the

---

[60] *United States v. Gamory,* 635 F.3d 480, 490 (11th Cir. 2011) (a Court reviews an affidavit for probable cause after adjusting for falsehoods and omissions).

[61] A:91, ¶10.

46

seizure and search of devices,[62] where in actuality he was coerced into acquiescing. It is telling that agents did not provide the magistrate with a copy, or even acknowledge the existence, of the audio.

Villalona also mislead the issuing magistrate about the timing of the signature on the Consent Form. Knowledge that the Consent Form was signed *after* the devices were seized from inside the Home would have been relevant to the magistrate's analysis. This is especially so where the Consent Form authorizes search of the devices only, and not the Home.[63]

Even the less significant portions of the Affidavit contained misrepresentations. Villalona exaggerated the significance of Ghost Photograpy, calling it "a company owned by Chavez."[64] Chavez did not own a company, but rather offered images for sale on Amazon with a user account,[65] earning only $2.50.[66] Similarly, Villalona exaggerated Chavez's connection to and interactions with Grant, the photographer behind the Riley photos. Despite what was conveyed

---

[62] A:91, ¶11.

[63] A:145.

[64] A:90.

[65] A:66; audio 11:49.

[66] A:66; audio 12:20. A:67; audio 13:21.

47

in the Affidavit,[67] Chavez did *not* actually "know" Grant.  Chavez never communicated with Grant directly.[68]  Rather, he reposted a public post on Grant's Instagram page, saying something to the effect of "check out Grant's page".[69]

These omissions and misrepresentations are readily confirmed by the undisputed facts in the record.  To that end, Chavez requests this Court to review the Affidavit inclusive of ommissions, and exclusive of misrepresentations, both of which are readily confirmed by the undisputed facts in the record.[70]

### (V)(C) The Affidavit Did Not Establish Probable Cause

Probable cause is "a fluid concept- turning on the assessment of probabilities in particular factual contexts- not readily, or even usefully, reduced to a neat set of legal rules." *Gates* at 232.  Because no set framework exists, the court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."   *Gates* at 232.

---

[67] A:91.

[68] A:69-70; audio 17:27 – 18:10.

[69] A:69-79; audio 16:55 – 18:10.

[70] The trial court did not reach the issue of *Franks* adjustments to the Affidavit.

A probable cause affidavit must outline "'facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched.' More specifically, the affidavit should establish a 'connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'" *United States v. Hendon,* 253 Fed. Appx. 809 (11th Cir. 2007) (citing *United States v. Martin,* 297 F.3d 1308, 1314 (11th Cir. 2002)).

Here, after *Franks* adjustments, the Affidavit contains only:

- a description of Villalona's training/experience;

- that a complaint was made to the FBI regarding possible child sex abuse material later identified as child erotica (the Riley photos);

- that the Riley photos were posted for sale by an Amazon account called Ghost Photography;

- that the Ghost Photography account is registered to Chavez and associated with his residence;

- that agents detained Chavez in an involuntary, custodial encounter, during which Chavez stated he:

  - earned $2.50 selling photos of teen models (but not child pornography) on the Ghost Photography account;

  - does not personally know Grant, the photographer of the Riley photos, nor has he ever contacted him directly;

  - created, in in response to a public post on Grant's Instagram page, a post which said something to the effect of "check out Grant's page". Per Grant's advertorial post, he would receive unspecified photos.

49

As a preliminary, absent fruits of the warrantless search, the Affidavit does not even identify the items to be searched.  (The device types and serial numbers of the devices were discovered during the unlawful warrantless search.)  The adjusted Affidavit offers only Villalona's generic expectation that devices would be located within the Home.  It would be impermissible to search any and all devices within the *jointly occupied* Home, without providing reason to believe a specific device is linked to criminal activity.  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that **the specific 'thing' to be searched** for and seized are located on the property to which entry is sought."  *Zurcher v. Stanford Daily,* 426 U.S. 547, 556, n.6 (1978).  (Emphasis added.)  There must be nexus between the items to be searched and alleged criminal activity.  *Id.*

The Affidavit further fails in that it sets forth only the barest bones of suspicion.  At best, the remaining representations suggest Chavez viewed and possessed photos which agents admit are child erotica.  It is not unlawful to possess child erotica.  Instructive is *United States v. Edwards,* 813 F.3d 953 (10th Cir. 2015), where even *distribution* of a significant amount of child erotica did not establish probable cause to search a home.

In *Edwards,* agents applied for a warrant.  As grounds therefore, they noted that while investigating a website which allows individuals to upload photographs

50

and post comments, they began tracking individuals involved in child exploitation. *Id.* at 957.  Agents observed the defendant regularly uploading sexually suggestive images of a ten (10) year old girl.  *Id.*  Agents also confirmed that: the defendant posted sexually suggestive comments about the child; his profile was associated with his email; and his profile used an IP address associated with his home.  *Id.* Agents observed the defendant share 715 images of child erotica, including images where the same girl was "only scantily clad, in various suggestive poses...." *Id.* (Descriptions of the *Edwards* images are virtually identical to descriptions of the Riley photos.)[71]

A warrant for the search of the defendant's home was issued, and agents discovered child pornography.  *Edwards,* 813 F.3d at 956.  The defendant moved to suppress the same, arguing his possession and sharing of hundreds of images child erotica did not establish a fair probability that he also possessed child pornography.  *Id.* at 958.  The trial court found the motion presented a close question and, because of circumstances not present in the case at bar,[72] ultimately

---

[71] Twenty-five (25) images depicted the child "dressed in what appeared to be a garland strand around her chest and another around her genital area[;]" one (1) photo "depicted her sitting with her legs spread apart." *Id* at 957-8.  Another series of forty-two (42) photos showed her in thong underwear revealing her entire buttocks.  One (1) photo showed her "sitting on the floor with her legs bent up and spread apart, showing part of her buttock and barely covering her genital area." *Edwards,* 813 F.3d at 958.

[72] The defendant shared hundreds of images child erotica, and made sexually explicit comments about children.

resolved that question in favor of the government. *Id.* The defendant appealed, and on review the denial of his motion to suppress was reversed.

Beginning its review, the Tenth Circuit Court of Appeals rejected the trial court's reliance on the investigating agent's "opinion that people who possess child pornography are also likely to possess child erotica, and [the defendant's] sexually suggestive comments about the child in the photographs." *Id.* at 960. Indeed, the *Edwards* Court held that the trial court erred in accepting the unsubstantiated claim that "those who possess *child pornography* are highly likely also to possess *child erotica.*" *Id.* at 965. (Emphasis in original.) More significantly, the Court found it was error to extrapolate from that opinion its inverse. *Id.* As in the case at bar, evidence in *Edwards* did *not* establish that collectors of child erotica are also likely to possess child pornography.[73] *Id.*

The Court stressed that unsavory conduct does not, without more, provide probable cause to believe an individual has engaged in unlawful activity. "In other contexts, courts are reluctant to presume that persons are inclined to engaged in certain illegal activity based on having engage in a particular legal activity." *Id.* at 964 (relying on *Jacobson v. United States,* 503 U.S. 540, 551 (1992). The Court

---

[73] Like in *Edwards,* the affidavit at bar alleges that persons involved in child pornography are likely to also possess child erotica. However, again like in *Edwards,* the affidavit does *not* assert that people who possess child erotica are likely to possess child pornography. Exhibit C, page 9, ¶20(a).

52

warned of "the danger of assuming that legal conduct", however worthy of disapproval, "suggests the actor is also inclined to engage in criminal conduct." *Edwards,* 813 F.3d at 964. Such an assumption neglects the fact that "most people obey the law even when they disapprove of it. This obedience may reflect a generalized respect for legality or the fear of prosecution, but for whatever reason, the law's prohibition are matters of consequence." *Id.* (citing *Jacobson,,* 503 U.S. at 551.) Stated differently, parties with a sexual interest in minors may well intentionally and carefully avoid child pornography, in favor of legal child erotica, to comply with the law.

Child erotica not establishing probable cause, the Court turned to additional recitations in the affidavit. Despite aggravating factors (none of which present in the case at bar),[74] the Court found the affidavit failed to establish probable cause.

---

[74] In *Edwards,* the affidavit established that the defendant regularly visited and uploaded child erotica to a website where individuals were known to trade in child pornography. *Id.* The *Edwards* defendant also made numerous sexually suggestive comments about children. *Id.*

*Edwards,* 813 F.3d at 967-70.   The *Edwards* Court stressed that even abhorrent lawful behavior does not provide probable cause.[75]  *Id.*

Here, the adjusted Affidavit contains no information which even suggests, let alone makes more probable than not, that the Home would contain evidence of a crime.  Chavez's possession of child erotica is offensive.  However, as illustrated by *Edwards,* the odious nature of the material is irrelevant to a probable cause determination.  The issuing magistrate would have been well within her right to judge Chavez as repugnant.  It cannot likewise be said, however, there was probable cause to believe that evidence of a crime would be found within his Home.  Accordingly, the warrant must be invalidated.

### (V)(D) The Good Faith Exception Does Not Apply

After finding an affidavit fails to set forth probable cause, a reviewing court must determine whether the good faith exception may apply.  Here, the Court should readily find that it does not.

---

[75] The Court relied on *United States v. Falso,* 544 F.3d 110, 122 (2d Cir. 2008) (noting that even though pedophilic tendencies have led to sex offense against children, courts cannot automatically equate those offenses with possession of child pornography); *United States v. Zimmerman,* 277 F.2d 426, 433, n.4 (3rd Cir. 2002) (disregarding expert opinion that collectors of child pornography hoard those materials, because the affidavit contained no indication that such materials were being so stored in a home); *United States v. Weber,* 923 F.2d 1338, 1344 (9th Cir. 1990) (finding no probable cause when confronted with evidence of the habits of pedophiles and child pornography collectors, as well as the fact that defendant on one occasion ordered but never picked up child pornography); *United States v. Adkins,* 169 F.App'x 961, 967 (6th Cir. 2006) (finding that the high incidence of child molestation by persons convicted of child pornography crimes does not, alone, demonstrate that a child molester is likely to possess child pornography).

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created the "good faith exception" allowing the use of evidence obtained by officers acting in good faith on a warrant later found to be unsupported by probable cause. However, in creating the good faith exception, the Court carved out several distinct situations where it *does not* apply.

> [**First**] the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based.  **Second**, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police."  …**Third**, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause."  [The magistrate's] "action cannot be a mere ratification of the bare conclusions of others."

*Id.* 914-15.  (Emphasis added, internal citations omitted.)  Thus, the good faith exception will not spare the fruits of an invalidated warrant if 1) the affidavit contains knowing or reckless misrepresentations; 2) a magistrate abandoned their neutral and detached role or served as a rubber stamp for police; or 3) a magistrate's probable cause analysis was deficient or improperly considered the totality of the circumstances.

"The purpose of the exclusionary rule is to deter unlawful police misconduct;" thus, suppression is required when "officers were dishonest or reckless in preparing their affidavit…."  *United States v. Martin,* 297 F.3d 1308, 1318 (11th Cir. 2002).  Likewise, the good faith exception *never* applies when

officers rely on observations made during a prior unlawful search to obtain a warrant. *United States v. McGough,* 412 F.3d 1232, 1240 (11th 2005). "In such a situation, 'the search warrant affidavit was tainted with evidence obtained as result of a prior, warrantless, presumptively unlawful entry into a personal dwelling." *Id.* (citing *United States v. Meixner,* 128 F.Supp. 2d 1070, 1078 (E.D. Mich. 2001).

*McGough* and *Leon* require suppression here. The warrant would not have been issued, but for: the prior unlawful search; agents' misrepresentations; *and* agents' knowing and reckless omissions. The warrant falls squarely within two of the exceptions outlined in *Leon*, as it was premised on falsities, and did not provide the magistrate with a substantial basis from which to confirm the existence of probable cause. Allowing agents to claim good faith where they drafted an Affidavit containing misrepresentations and omissions (particularly those which relate to coercive police practices) would vitiate the punitive and corrective effect of the exclusionary rule.

## VI.  CONCLUSION

There is no mistake that Chavez was discovered in possession of odious contraband. Equally clear, however, is the fact that said evidence flows from an unlawful, warrantless search. Only through reliance on the warrantless search did agents obtain the warrant challenged on appeal.

56

Our laws do not provide different standards for suppression; evidence which shocks the conscience is subject to the same treatment as "less offensive" contraband.  The Constitution is blind to the nature of evidence obtained in violation of the Fourth Amendment, and requires suppression of *all* materials recovered through police misconduct.

As noted time and again by the United States Supreme Court, the exclusionary rule is integral to preserving the constitutional rights of all citizens.

> Ever since it's inception, the rule… has been recognized as a principal mode of discouraging lawless police conduct.  Thus it's major thrust is a deterrent one, and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere "form of words."

*Terry v. Ohio*, 392 U.S. 1, 12, (1968).  "Stated differently, the courts can protect the innocent and law abiding against unreasonable searches and seizures 'only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty' because such exclusion removes the incentive for the police to engage in lawless behavior against anybody, innocent and guilty alike." *Gonzalez v. State,* 578 So.2d 729, 735 (Fla. 3rd DCA 1991) (citing *Brinegar v. United States,* 338 U.S. 160, 181 (1949).

Chavez respectfully prays the Court will: reverse the denial of his Motion to Suppress; reverse his conviction, and remand this matter with instructions that he discharged from further prosecution.

## VII.   CERTIFICATE OF COMPLIANCE

The foregoing brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and has been prepared (with the exception of footnotes) in Times New Roman size 14 font.  The brief contains 12,999 words.

 /s/ Juan Mourin
Juan Mourin, Esq.
Fla Bar No 103438
The Law Offices of Grey & Mourin
1400 NW 10th Ave., Suite RG6
Miami, FL 33136
Tel: (305) 325-8119
Fax: (305) 325-0569
Email: Eservice@greyandmourin.com
Juan@greyandmourin.com

## VIII.  CERTIFICATE OF SERVICE

 **I HEREBY CERTIFY** that on this 27th day of August 2025 a true and correct copy of the foregoing was electronically filed, with service to:

John Ley, Clerk of Court
United States Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

United States Attorney's Office
99 NE 4th Street
Suite 515
Miami, FL 33132

Federal Public Defender
150 West Flagler Street
Suite 1700

Miami, FL 33130

 /s/ Juan Mourin

Juan Mourin, Esq.
Fla Bar No 103438
The Law Offices of Grey & Mourin
1400 NW 10th Ave., Suite RG6
Miami, FL 33136
Tel: (305) 325-8119
Fax: (305) 325-0569
Email: Eservice@greyandmourin.com
      Juan@greyandmourin.com